UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY AND NICHOLAS CHAD GONZALEZ | CIVIL ACTION |
| VERSUS | NO. 15-570 |
| PORTER, INC., D/B/A FORMULA BOATS | SECTION "R" (4) |

### ORDER AND REASONS

Before the Court is Defendant Porter, Inc.'s motion in limine and *Daubert* motion to strike the report of Plaintiffs' expert witness, Troy Little, and to prohibit Little from testifying at trial.[1] For the following reasons, the Court GRANTS defendant's motion.

### I.   BACKGROUND

This lawsuit arises out of a fire onboard the *Budget Bender*, a recreational boat owned by plaintiff Nicholas Chad Gonzalez, that occurred on or about December 21, 2013 and rendered the boat a total loss. The boat was insured by Atlantic Specialty Insurance Company, which paid Gonzalez

---

[1]   R. Doc. 27.

$280,000 on his insurance claim. Plaintiffs assert claims against the boat's manufacturer, Porter, Inc., for redhibition, breach of contract, products liability, and negligence.[2] Plaintiffs allege that the fire was caused by an electrical malfunction attributable to corroded wiring in the port side of the boat.[3] According to plaintiffs, a gap along the edge of a wet bar in the boat's cockpit allowed water to flow downward and onto the wiring below, causing the corrosion.[4] Plaintiffs allege that this corrosion caused a short circuit that energized wires, causing them to overheat and eventually ignite a fire.[5] To support this theory, plaintiffs retained three experts: Captain Guy Plaisance, a marine surveyor; Gary Jones, a fire causation consultant; and Troy Little, an electrical engineer.[6]

Little investigated the *Budget Bender* on January 31, 2014, March 12, 2014, and July 17, 2014, and submitted a report of his findings on August 5, 2014.[7] Little's report noted that he had confirmed Gary Jones' analysis of the fire's origin, and the report recited Little's evaluation of the electrical

---

[2] R. Doc. 1-2 at 3-4.
[3] *Id.* at 2.
[4] *Id.*
[5] *Id.*
[6] Defendant has also moved the Court to strike the reports of Jones and Plaisance, to prohibit them from testifying, and to strike the "hose-test" video demonstrations prepared by Plaisance. *See* R. Doc. 26 (Jones); R. Doc. 29 (Plaisance). The Court will address those motions separately.
[7] R. Doc. 27-2 at 1-2.

wiring behind the sofa where the fire originated.[8] Little's report stated that while performing a visual inspection, he observed a corroded pigtail connection that "exhibited signs of electrical damage consistent with that of water intrusion."[9] Though Little was unable to determine the relationship between the pigtail connector and the wiring harnesses routed through the fire origin area, Little's report theorized that the circuits in the deteriorated pigtail connector short circuited, which energized the circuits and bypassed the protective circuit breakers, causing current to travel through the wiring harness and overheat "butt-splice" connectors, starting the fire.[10] Little concluded that water ingress into the pigtail connection caused its corrosion and deterioration.[11] However, Little's report did not identify which specific connector failed, nor did it describe or explain the steps Little took to confirm his "conclusion."[12]

Porter now moves the Court to exclude Little's report and to prohibit Little from testifying. Porter gives three arguments for exclusion: (1) that plaintiffs failed to submit an expert report on behalf of Little; (2) that the document plaintiffs did submit failed to satisfy the technical requirements of

---

[8]     *Id.* at 2.
[9]     *Id.*
[10]    *Id.* at 2-3.
[11]    *Id.* at 4.
[12]    *Id.*

Federal Rule of Civil Procedure 26 and this Court's scheduling order; and (3) that Little does not base his proffered expert testimony on reliable data and sound methodologies, as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs initially responded to defendant's Rule 26 arguments[13] but not its *Daubert* argument. The Court ordered plaintiffs to address the *Daubert* issues.[14] Plaintiffs filed their response,[15] and defendant replied.[16]

## II.   LEGAL STANDARD

When expert testimony offered by one party is subject to a *Daubert* challenge, the Court must act as a "gatekeeper" under Federal Rule of Evidence 702.

A district court has considerable discretion to admit or exclude expert testimony under Rule 702. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). Rule 702, which governs the admissibility of expert witness testimony, provides:

---

13   R. Doc. 36.
14   R. Doc. 50.
15   R. Doc. 57.
16   R. Doc. 60.

4

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93.

The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590.

The Court in *Daubert* articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-95. The Supreme Court has emphasized, however, that these factors "do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 593). Rather, district courts "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts have also considered whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995), whether the expert has adequately accounted for obvious alternative explanations, *see Claar v. Burlington*

6

*N.R.R.*, 29 F.3d 499 (9th Cir. 1994), and whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997).

The Court also considers this motion recognizing that this case involves a nonjury trial. In *Daubert*, the Supreme Court's overriding concern was with the problem of exposing the jury to confusing and unreliable expert testimony. *See* 509 U.S. at 595-97. In the wake of *Daubert*, several courts have recognized that in the context of a bench trial, as is the case here, "the *Daubert* gatekeeping obligation is less pressing," because the gatekeeper and trier of fact are the same. *Volk v. United States*, 57 F. Supp. 2d 888, 896 n.5 (N.D. Cal. 1999); *see also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002) (explaining that in the context of a bench trial the *Daubert* standard must still be applied but the concerns about expert evidence misleading a jury "are of lesser import"); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). Nevertheless, *Daubert* still applies in bench trials, and this Court must still ensure that the proffered testimony is reliable. *See id.*

Expert testimony "must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation omitted). "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

In *Joiner*, the Supreme Court explained that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 522 U.S. at 146. Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 98 (5th Cir. 2010).

If the Court is satisfied that the expert's testimony is reliable, the Court must then determine whether the expert's analysis is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See Daubert*, 509 U.S. at 591. "[F]undamentally unsupported" opinions "offer[] no expert

8

assistance to the [trier of fact]" and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (citing *Viterbo*, 826 F.2d at 422).

## III. DISCUSSION

### A. Motion to Strike

Before reaching the merits of defendant's *Daubert* motion, the Court will address defendant's argument that Little's expert report[17] should be stricken because it does not comply with Federal Rule of Civil Procedure 26, and this Court's scheduling order, which requires that expert reports fully set forth "all matters about which [the expert witness] will testify and the basis therefor" and "be obtained and delivered to counsel for Defendant as soon as possible, but in no event later than April 15, 2016."[18] Rule 26(a)(2)(B) provides that, "unless otherwise stipulated or ordered by the court," a party must disclose its expert witnesses along with a written report prepared and signed by the witness that contains:

---

[17] Defendant adamantly maintains that the Little report should not even be considered a "report," and refers to the document throughout its motion as the "Little Letter." *See generally* R. Doc. 27-1. However, Little writes in the first paragraph of the document, "[p]lease accept the following *as a report* of my findings. R. Doc. 27-2 at 1 (emphasis added). Though what to call the document may just be semantics, the Court will treat Little's document as an expert report.

[18] R. Doc. 18.

9

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Because Little's report does not include many of these requirements, defendant argues the report must be stricken.

Defendant's argument that plaintiff has violated Rule 26(a)(2)(B) fails to recognize that the Court has "otherwise stipulated or ordered" that an expert report must merely set forth "all matters about which they will testify and the basis therefor" and be delivered to defendant by April 15, 2016.[19] *See Knorr v. Dillard's Store Services, Inc.*, No. 04-3208, 2005 WL 2060905, at *2 (E.D. La. Aug, 22, 2005) (rejecting similar argument of technical noncompliance with Rule 26 because of Court's scheduling order). Though Little's report certainly could have been more detailed (which he himself admitted in his deposition), it sufficiently establishes that he will be testifying as to his hypothesis that water ingress into the electrical system caused a short circuit which ultimately led to the fire.[20] Additionally, the

---

[19] R. Doc. 18 at 2.
[20] R. Doc. 27-2 at 2-4.

10

report notes that Little's conclusions are based on his examinations of the fire scene and his visual inspections of the damaged electrical connections routed through the boat to the fire origin area.[21] Any confusion or questions that defendant had over the basis for Little's conclusions could be addressed in a deposition or through other discovery means. *See Kirkland v. Marriott Int'l Inc.*, 416 F. Supp. 2d 480, 486 n. 2 (E.D. La. 2006) (refusing to strike report with information that was difficult to understand because information was clarified in subsequent deposition); *Stahl v. Novartis Pharm. Corp.*, No. 99-1048, 2000 WL 33915847, at *2 (E.D. La. Nov. 29, 2000) (same). Finally, defendant received Little's report in August 2015, well before the April 2016 deadline.[22] Therefore, Little's report is timely and adequately sets forth the matters about which he will testify and the basis for his opinions.

Furthermore, although Little's report did not include information like the exhibits used to support his conclusions, his qualifications, his compensation, or other cases in which he has testified as an expert, plaintiffs separately gave defendant the photographic exhibits that Little relied on,[23] his compensation,[24] and his resume, which included his qualifications and a

---

[21] *Id.*
[22] R. Doc. 27-1 at 2.
[23] R. Doc. 36 at 14.
[24] R. Doc. 36-13.

11

list of cases in which Little has testified as an expert either at trial or by deposition.[25] Defendant had all of this information before Little's deposition and was not prejudiced by its omission from Little's report.

For the foregoing reasons, plaintiffs' technical noncompliance with Rule 26 does not warrant this Court's striking Little's report. *See Knorr*, 2005 WL 2060905 at *2.

### B. *Daubert*

In addition to its Rule 26 argument, defendant argues that Little's report does not comply with the standards of Federal Rule of Evidence 702 and *Daubert*. In support, defendant maintains that Little's conclusions are unreliable because Little's theory of causation is scientifically unsupportable and does not conform with the Scientific Method as applied to fire causation investigations, as explained by National Fire Protection Association publication 921, *Guide for Fire and Explosion Investigations*.[26] The Court finds that defendant's arguments have merit.

In determining whether an expert's methodology is sufficiently reliable, *Daubert* asks, among other things, whether the expert's methodology can be controlled by standards, and whether the theory or

---

[25] R. Doc. 36-12.
[26] R. Doc. 27-1 at 16.

methodology is generally accepted within the scientific community. 509 U.S. at 594. Courts largely agree that the peer-reviewed NFPA 921 embodies the standards of the field of fire investigation and causation. David L. Faigman et al., 5 *Modern Scientific Evidence* § 37:9 (2015-2016 ed.); *see also Johnson v. Samsung Elec. Am., Inc.*, 277 F.R.D. 161, 165-66 (E.D. La. 2011); *Butcher v. Allstate Ins. Co.*, No. 06-423, 2009 WL 301822, at *3 (S.D. Miss. Feb. 5, 2009) ("It is well recognized that [NFPA 921] is the most generally accepted standard for methodology for [fire scene investigation]."); *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 366 (D. Conn. 2001) (noting that NFPA 921 is "a peer reviewed and generally accepted standard in the fire investigation community").

NFPA 921 explains that in order to apply the Scientific Method to fire incident investigation, the investigator must follow seven steps: (1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) select a final hypothesis. *National Fire Protection Association 921: Guide for Fire and Explosion Investigation*, 19 (2014). It goes on to note that a hypothesis can be tested "physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research . . . ." *Id.* It further observes that "whenever the investigator relies on research as a

means of hypothesis testing, references to the research relied upon should be acknowledged and cited." *Id.* at 20. Simply identifying a fuel or ignition source does not and cannot describe how a fire came to be. The investigator must determine and test the sequence of events that allowed for combustion to begin. *Id.* at 201-02.

NFPA 921 devotes an entire chapter to fires started by electricity. According to NFPA 921, for a fire to start from an electrical source, the electrical wiring, equipment, or component must have been energized, and this energy must produce sufficient heat and temperature to ignite nearby combustible material. *Id.* at 107. Ignition will not occur unless the heat transfer from the electrical source is maintained for long enough to bring the fuel source to its ignition temperature. *Id.* NFPA 921 states that before a fire can properly be determined to have been caused by electricity, the source of heat, the temperature generated, the first ignited fuel, and the path of transfer from the heat source and the ignited fuel must be calculated or identified. *Id.* Finally, the NFPA cautions that the investigator must be careful not to assume that abnormal electrical activity or damage (like arcing) is evidence that the fire was caused by electricity, because this damage can be both the cause of the fire or a result of the fire. *Id.* at 109.

Little's report states his hypothesis that electrical activity caused the fire on the *Budget Bender*. Little posits that due to water ingress, a pigtail electrical connector corroded to the point that it caused a short circuit, which energized circuits with no circuit breaker protection.[27] These energized circuits supposedly created energy that traveled through the wiring harness and other electrical connections until they overheated and started the fire.[28] Little based his conclusions on his analysis of the boat's electrical system and his personal observations of the pigtail connection, the wiring harness, and other conductors, which revealed evidence of electrical activity and damage.[29]

Though Little's theory seems possible, his report and subsequent deposition reveal two fatal flaws with his methodology that undercut its reliability: Little does not provide critical data, and he never tested his hypothesis. The Court addresses each deficiency in turn.

### 1. Lack of Critical Data

Little's report never identifies when the short circuit occurred, the magnitude and duration of the current generated by the short circuit, or the

---

[27] R. Doc. 27-2 at 3-4. Contrary to defendant's expert report, Little did not say there were no circuit breakers in the wiring. Rather, he stated that the short circuit allowed the circuit breakers to be bypassed. *Id.* at 3.
[28] *Id.* at 3.
[29] *Id.* at 2-4.

amount of energy created and the temperature generated. In fact, Little's report acknowledges that he never identified the specific connector or conductor that failed, the devices that "may have been involved," or "whether or not the ground circuit was involved."[30] Nor did he determine the relationship between the pigtail connector and the wiring harnesses routed through the fire origin area.[31]

Without this data, Little's proposed cause of the fire is nothing more than a possibility rooted in speculation, a flaw that at least one other district court has found to warrant exclusion of an expert electrical engineer in a fire case. *See Gross v. DaimlerChrysler Corp.*, No. 01-3203, 2003 WL 23305157, at *4 n.6 (D. Md. Sept. 29, 2003) (expert's theory that the most likely scenario was that the electrical fire was caused by short circuit was rooted in "pure speculation [as] there is no identification whatsoever of the source, cause or measurable "severity" of the alleged overcurrent"). The data that Little does possess and rely on, the electrical activity and damage in some of the electrical connections, is at best equally consistent with being the cause of the fire and an effect of the fire, and at worst more likely evidence of an effect of the fire. *See NFPA 921* at 109; Faigman, *supra*, at § 37:51 ("Did the

---

[30] *Id.*
[31] *Id.*

16

wire short and start the fire, or did the fire burn the insulation and cause the wire to short? Almost always it is the latter.").

### 2. *Lack of Testing*

Little likely would have developed some of the important data, and shown whether the electrical damage was a cause or the effect of the fire, had he tested his theory. Unfortunately, and despite having over two years to do so, Little never did any testing to confirm his hypothesis.[32] NFPA 921 makes clear that a hypothesis as to the cause of a fire should be tested before any cause can be officially determined. In his deposition, Little admits that he intended at the time he drafted his report to do testing, including X-ray tests, metallurgical tests, destructive analysis, and laboratory analysis of the boat's wiring.[33] This testing would have allowed Little to "clarify absolutely" whether the corrosion that Little opines caused the short circuit occurred before the fire or because of it, or even because of the water used by the firefighters to put out the fire.[34] Little also admits that additional testing and analysis could have shown whether an external device plugged into the

---

[32] Plaintiffs did test their theory of how water could have entered the electrical system in Captain Plaisance's "hose-test." As defendant seeks to exclude that evidence, the Court addresses its admissibility in another order.
[33] R. Doc. 60-1 at 11.
[34] *Id.* at 9-10.

17

same pigtail connector could have failed and caused the fire.[35] Although physical experimentations and recreations are not the only means by which a hypothesis can be tested, Little did not even refer to any scientific research or publications that he used to test his hypothesis analytically. *See NFPA 921* at 20. Nor did he refer to any calculations or models he used to test his theory.

Failure to test a hypothesis has been found particularly relevant by other courts in *Daubert* fire cases. *See Hammond v. Coleman Co., Inc.*, 61 F. Supp. 2d 533, 539 (S.D. Miss. 1999) (excluding engineering expert in products liability fire case in part because expert did "not attempt to simulate or recreate [sic] the incident . . . . [and has] conducted no tests"), *aff'd*, 209 F.3d 718 (5th Cir. 2000); *Comer v. Am. Elec. Power*, 63 F. Supp. 2d 927, 938 (N.D. Ind. 1999) (excluding electrical engineering expert in fire case in part because the expert never did "any testing to determine how many volts it would actually take" to start fire); *Knotts v. Black & Decker, Inc.*, 204 F. Supp. 2d 1029, 1045 (N.D. Ohio 2002) (excluding electrical engineering expert in fire case in part because of lack of testing to verify expert's theory that product could lead to overheating and fire).

---

[35] *Id.* at 12-13.

This Court agrees with the reasoning in those cases and finds that Little's failure to test his hypothesis, combined with his failure to obtain the relevant data, renders his methodology unreliable. As it stands, all that connects the data to Little's theory is *ipse dixit*. *See Joiner*, 522 U.S. at 146. Without more data and testing, "there is simply too great an analytical gap between the data and the opinion offered," *id.*, and plaintiffs have not met their burden in establishing Little's reliability. *See Moore*, 151 F.3d at 276.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to exclude the expert testimony of Troy Little.

New Orleans, Louisiana, this __20th__ day of October, 2016.

                                                             _____
                                                                 SARAH S. VANCE
                                            UNITED STATES DISTRICT JUDGE