UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ATLANTIC SPECIALTY INSURANCE                    CIVIL ACTION
COMPANY AND NICHOLAS CHAD
GONZALEZ

VERSUS                                          NO. 15-570

PORTER, INC., D/B/A FORMULA                     SECTION "R" (4)
BOATS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

This dispute arises out of a fire onboard the *Budget Bender*, a recreational boat owned by Plaintiff Nicholas Chad Gonzalez. The fire occurred on or about December 21, 2013 and rendered the boat a total loss. The boat was insured by Atlantic Specialty Insurance Company, which paid Gonzalez $280,000 on his insurance claim.  On or about December 19, 2014, plaintiffs filed this action in the 22nd Judicial District Court of the Parish of St. Tammany, Louisiana.[1]  On February 23, 2015, defendant removed the case to this Court.[2]  Plaintiffs sued the boat's manufacturer, Porter, Inc., for

---

[1]    R. Doc. 1 at 1.
[2]    *Id.*

redhibition, breach of contract, products liability, and negligence.[3]  Plaintiffs withdrew their breach of contract claim before trial.[4]

Plaintiffs alleged that the fire was caused by an electrical malfunction attributable to corroded wiring in the port side of the boat.[5]  According to plaintiffs' complaint, a gap along the edge of a wet bar in the boat's cockpit allowed water to flow onto the wiring below, causing the corrosion.[6] Plaintiffs alleged that this corrosion caused a short circuit that energized wires beneath the boat's sofa in the starboard side of the boat, causing them to overheat and eventually ignite a fire.[7]

On November 8-9, 2016 the Court held a bench trial.  The Court has diversity jurisdiction under 28 U.S.C. § 1332, because the parties are citizens of different states and the matter in controversy exceeds $75,000.  After hearing live testimony and reviewing all the evidence, the Court rules as follows.

---

[3]   R. Doc. 1-2 at 3-4.
[4]   R. Doc. 55 at 11.
[5]   R. Doc. 1-2 at 2.
[6]   *Id.*
[7]   *Id.*

2

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Background

Plaintiff Chad Gonzalez is a resident of Slidell, Louisiana and the owner of the *Budget Bender*, the boat involved in this litigation.[8]  Plaintiff Atlantic Specialty Insurance Company was and is the hull insurer of the *Budget Bender* and is the assignee/subrogee of Gonzalez's claim to the amount of $280,000, which is the amount Atlantic paid for the loss of the *Budget Bender*.[9]  Gonzalez asserts a claim to the amount of $2,633 worth of uninsured property damages from the fire.[10]

Atlantic is a New York insurer licensed to do business in the State of Louisiana.[11]  Defendant Porter, Inc. is an Indiana corporation and does business as Formula Boats.[12]  According to the testimony of Porter's Michael Boyd, Porter manufactures recreational boats and sells the boats through a network of dealers throughout the United States.[13]  Among the lines of boats manufactured by Porter is the Performance Cruiser line.[14]  Porter began

---

[8]    Testimony of Chad Gonzalez.
[9]    Uncontested Material Facts, w, x.
[10]    Pls.' Ex. 10.
[11]    R. Doc. 1-2 at 1.
[12]    R. Doc. 55 at 2.
[13]    Testimony of Michael Boyd.
[14]    Uncontested Material Facts, a.

manufacturing the Performance Cruiser line in about 1986 and has manufactured approximately 4,000 Performance Cruisers since 1986.[15]

The *Budget Bender* is a thirty-seven foot Performance Cruiser.[16] Porter began manufacturing this model in about 2002 and has manufactured approximately 250 of them since that time.[17]  Boyd testified that the thirty-seven foot Performance Cruisers are built with a cockpit equipped with a built-in wet bar.[18]  As manufactured, the wet bar has a hinged lid that can be raised and lowered manually and a drain meant to collect and discharge water within the wet bar to the deck.[19]  Boyd testified that this drain looks like a "slight opening" and is known as a "weep hole."[20]  The weep hole is a drain about a half inch in diameter designed to channel water under the wet bar back out to sea.[21]  According to Boyd, the wet bar is above and slightly forward of the boat's engine room, which contains bundled electrical wires that are connected to the boat's electrical system.[22]  Boyd explained in his testimony that these bundles are commonly referred to as "pigtails."[23]  The

---

[15]    Uncontested Material Facts, a, c; testimony of Boyd.
[16]    Uncontested Material Facts, e.
[17]    Uncontested Material Facts, d, f.
[18]    Testimony of Boyd.
[19]    *Id.*
[20]    *Id.*
[21]    *Id.*
[22]    *Id.*; Pl.'s Ex. 4-20.
[23]    Testimony of Boyd.

4

terminal connections within these pigtails and the electrical wires themselves are tin-plated to resist water corrosion.[24]  According to Porter's product systems manager Steve Boyce, the bundled connections within the pigtails are covered by a protective loom.[25]  The looms are split open on one side so that if any moisture gets inside, it can drain out.[26]

The boat also includes removable curtains that surround the cockpit area that are intended to protect the cockpit from weather and sea spray.[27]  Boyd testified that every one of the approximately 4,000 Performance Cruisers manufactured by Porter includes the same wet bar design as the *Budget Bender*, including the same weep hole, and the same basic pigtail locations.[28]

### B.    The *Budget Bender*

The *Budget Bender* was completed in April 2008.[29]  After completion, Porter used the *Budget Bender* for several months for a promotional photo shoot and as a demonstration model.[30]  In August 2008, the *Budget Bender*

---

[24]    Testimony of Carl Natale.
[25]    Testimony of Steve Boyce.
[26]    *Id.*
[27]    Uncontested Material Facts, g.
[28]    Testimony of Boyd.
[29]    Uncontested Material Facts, h.
[30]    Uncontested Material Facts, i.

was sold to Todd Kelley.[31]  Kelley bought the boat from Captain's Choice Boats, a Porter dealer in Destin, Florida.[32]  According to the testimony of plaintiffs' expert Gary Jones (a fire causation and origin expert), his research into the fire revealed that Kelley had a coaxial cable for the boat's radio installed during the time that Kelley owned the boat.[33]   Kelley owned the boat for two years, and then traded the *Budget Bender* back to Captain's Choice Boats.[34]

Gonzalez testified that he bought the *Budget Bender* from Captain's Choice Boats in August 2010 for the purchase price of $257,661.[35] As part of the purchase of the *Budget Bender*, Gonzalez traded in a used boat valued at $35,000.[36] Gonzalez owned the boat continuously from August 2010 through the time of the incident that is the subject of this litigation.[37] Gonzalez testified that his family frequently used the *Budget Bender* for recreational purposes.[38]  During the summer, Gonzalez would take the boat

---

[31]   Uncontested Material Facts, j.
[32]   *Id.*
[33]   Testimony of Gary Jones.
[34]   Uncontested Material Facts, k.
[35]   Uncontested Material Facts, l; Pls.' Ex. 34.
[36]   Pls.' Ex. 35.
[37]   Uncontested Material Facts, n.
[38]   Testimony of Gonzalez.

to Florida, and would leave the boat in a dry storage building in Florida when the boat was not in use.[39]

With the exception of when the boat was in Florida, Gonzalez kept the boat moored in a slip at the Slidell Marina in Slidell, Louisiana.[40]  Gonzalez testified that he was meticulous in maintaining the *Budget Bender*, and would hose the entire boat down (including the cockpit and wet bar) by spraying it with water nearly every time he used the boat.[41]  He also testified that he always kept the curtains on the *Budget Bender* zipped and closed when the boat was not in use.[42]  According to Gonzalez, the curtains effectively diverted water and rain from the wet bar when the boat was not in use, but directed water onto the wet bar when the boat was operated in the rain.[43]  According to Gonzalez's testimony, this was not a lot of water; it was a "small bead of water."[44]  Gonzalez testified that until the 2013 fire, he was very satisfied with the performance of the *Budget Bender*, that it was a "dry ride," meaning that he never had any problems with water coming into the boat while operating it, and that he never experienced any significant

---

[39]   *Id.*
[40]   Uncontested Material Facts, o.
[41]   Testimony of Gonzalez.
[42]   Uncontested Material Facts, p.
[43]   Testimony of Gonzalez; deposition testimony of Gonzalez.
[44]   Testimony of Gonzalez.

electrical problems with the boat.[45]  Gonzalez also testified that he never added any electrical components to the boat.[46]

## C.   The Fire

The *Budget Bender* caught on fire on December 21, 2013.[47]  The boat was moored at the Slidell Marina and was connected to the A/C shore power supplied by the Marina at the time of the fire.[48]  The fire originated on the starboard side of the vessel underneath a sofa in the aft cabin.[49]  Plaintiffs' expert Jones and Porter's Boyce agree that the fire started when several wire connections within a pigtail on the starboard side of the vessel melted and ignited the wood frame and sofa cushions.[50]  After the fire, Atlantic paid Gonzalez $280,000 for the loss of the boat.[51]   Additionally, Gonzalez submitted evidence that he sustained $2,633 worth of uninsured property damages from the fire.[52]

---

[45]     *Id.*
[46]     *Id.*
[47]     Uncontested Material Facts, q.
[48]     *Id.*; Uncontested Material Facts, s.
[49]     Uncontested Material Facts, r; testimony of Jones.
[50]     *Id.*; testimony of Boyce.
[51]     Uncontested Material Facts, w, x.
[52]     Pls.' Ex. 10.

### D.    Cause of Fire

After the fire, plaintiffs retained three experts to determine the cause of the fire.  Two of those experts, Troy Little and Captain Guy Plaisance, were excluded from testifying because of serious reliability concerns under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[53]    As a result, only three witnesses provided testimony relating to the cause of the fire: (1) Gary Jones, plaintiffs' remaining expert, (2) defendant's expert Carl Natale, and (3) plaintiff Chad Gonzalez.  Jones could not give an opinion on the cause of the fire because he gave no opinion on the cause of the fire in his expert report.  Jones did exclude certain causes in his expert report, and he was allowed to testify as to the causes he excluded.  He also testified about statements allegedly made by Porter's representative Steve Boyce at the joint investigation. Defendant's fire causation expert Carl Natale gave his opinion on the cause of the fire. Finally, Plaintiff Chad Gonzalez testified as to his actions on the *Budget Bender* before the fire.

Jones testified that plaintiffs' experts completed multiple inspections of the boat.  On February 14, 2014, Porter was notified about the fire on the Budget Bender.   On March 12, 2014, plaintiffs' experts and two

---

[53]    R. Doc. 75; R. Doc. 89.

representatives of Porter, Boyd and Boyce, conducted a joint inspection of the Budget Bender.   According to both Jones' and Boyce's testimony, at the joint inspection the parties agreed that a D/C wiring connector melted and that these melted wires were the origin of the fire.[54]   The parties also noted that on the opposite site of the boat there was another D/C wiring connection (or pigtail) that had corrosion on the outside of the connection.[55]   This pigtail connection was underneath the boat's wet bar and was partially covered by a protective loom.

Gonzalez testified that at the time of the fire, he had left a portable heater on in the engine room of the *Budget Bender*.[56]   Jones testified without contradiction that he field tested the heater after the fire and it still worked, and that he found no issue with the heater or its electrical cord.[57]   Gonzalez also testified that he could not recall whether he had turned off the batteries that charge the D/C circuitry throughout the boat before the fire occurred.[58]

Jones testified that in the course of his investigation he found no signs of vandalism to the boat, that there was no evidence that any property had

---

[54]   Testimony of Jones; testimony of Boyce.
[55]   Testimony of Jones; testimony of Boyd.
[56]   Uncontested Material Facts, t.
[57]   Testimony of Jones.
[58]   Testimony of Gonzalez.

been removed, and that door to the cabin was still locked after the fire.[59] Based on this, Jones excluded arson and intentional human activity as a cause of the fire.[60]  Jones also testified that he performed voltage readings on the marina's shore power system after the fire.[61]  Based on the voltage readings, Jones determined that the shore power system was in compliance with the electrical codes and that there was no evidence of any electrical issue that would have caused the fire.[62]  Jones further testified that through his multiple investigations he was also able to exclude the Molex wire connectors as a cause of the fire because the Molex connectors were serviced by A/C wiring, but the wiring at the origin point was D/C wiring.[63]  Finally, Jones' testimony made clear that he did not reach a conclusion as to what caused the fire.[64]  He did, however, testify that during the joint investigation, Porter's Steve Boyce voiced his opinion that "corrosion at the engine compartment connector is a probable cause of loss."[65]

---

[59]     Testimony of Jones.
[60]     *Id.*
[61]     *Id.*
[62]     *Id.*
[63]     *Id.*  Molex is the manufacturer of some of the connectors used on the *Budget Bender*.
[64]     *Id.*
[65]     *Id.*

11

The Court finds that Jones' testimony excludes both arson and intentional human activity as a cause of the fire.[66]   His testimony also excludes the A/C shore power connection as a cause of the fire, as well as the Molex connectors.[67]   Finally, Jones' testimony that the space heater was not located near the origin of the fire and was still operational after the fire excludes the possibility that the portable heater caused the fire by igniting nearby combustible material, but his testimony failed to exclude the heater and its wires as an electrical cause of the fire.[68]

The Court does not find that Jones' testimony regarding the statement by Steve Boyce is credible evidence that corrosion was the cause of the fire. First, Boyce testified under oath that he did not reach a conclusion as to the cause of the fire during the joint investigation and that he did not make any statement to any of the plaintiffs' representatives regarding corrosion in the pigtail as a cause of the fire.[69]   Second, even if Boyce did make that statement, Boyce is not an electrical engineer or a fire causation expert, and is not qualified to opine on whether corrosion found after a fire is evidence of the cause, rather than an effect, of the fire.   Finally, before Jones testified as to

---

[66]     *Id.*
[67]     *Id.*
[68]     *Id.*
[69]     Testimony of Boyce.

Boyce's specific statement, he testified that those present at the joint investigation were discussing a wide range of potential theories of what could have caused the fire, and that these statements were made before anyone had examined the boat's electrical system or the mapping of the boat's wiring connections.[70]  Therefore, if Boyce did make this statement (which he lacked the expertise to make definitively), the Court finds that it was made speculatively and in the context of exploring possible causes of the fire, not the definitive cause.

Defendant's expert Natale took the stand after Jones.  Natale is an expert in the field of fire origin and investigation.   Natale testified that he visited the boat in 2016 and observed the damage from the fire, and observed the wires that were the point of origin.[71]  He testified that he did observe corrosion on the pigtail connector in the engine compartment, but that it could not be determined if the corrosion occurred before or after the fire.[72] Natale testified that he could not date the corrosion because by the time Natale observed the corroded pigtail it had been exposed to the elements for

---

[70]     Testimony of Jones.

[71]     Testimony of Natale.

[72]     *Id.*

13

a long period of time and also because the fire itself could have caused the corrosion.[73]

From his investigation, Natale testified that in his opinion, without any doubt, the cause of the fire on the *Budget Bender* was "undetermined."[74] Natale came to this conclusion because in order to determine the cause of an electrical fire, one must trace the relevant circuitry and wiring and exclude wires that do not show damage in order to isolate the wires with abnormal electricity activity.[75]  Natale testified that once these abnormal wires have been isolated, they should be tested.[76] This testing includes metallurgical testing, cleaning the wires ultrasonically, and examining the wires microscopically and with X-rays to determine the extent of the abnormal activity.[77] But Natale testified that to the best of his knowledge this testing was never done, and by the time he examined the *Budget Bender* the wires and pigtails had already been cut out of the boat, making this tracing and testing impossible.[78]  Because Natale could not do the requisite tests to determine the cause, he testified that the cause was undetermined.[79]

---

[73]  *Id.*
[74]  *Id.*
[75]  *Id.*
[76]  *Id.*
[77]  *Id.*
[78]  *Id.*
[79]  *Id.*

14

Natale further testified that "undetermined" is a legitimate cause of fire according to *National Fire Protection Association 921*, which is a guide for fire and explosion investigations.[80]  Natale testified that it is "probably the case" that the cause of fire in 50 percent of fires is undetermined.[81]  Natale concluded by testifying that if the tests he previously mentioned were done, determining the cause of fire would have been considerably more likely.[82]

Plaintiffs' proposed findings of facts made clear that plaintiffs' theory of the cause of the fire was that water intrusion corroded wiring in the pigtail connector in the engine compartment, which eventually caused a short circuit, which allegedly energized wires and ultimately caused them to melt and ignite the fire. Plaintiffs' electrical engineering expert Troy Little, however, was excluded from testifying.  As a result, plaintiffs put forward no credible evidence at all to establish that a short circuit even occurred, much less that it caused the fire.  Plaintiffs also did not introduce any evidence or testimony to rebut Natale's testimony that the cause of the fire is undetermined.

---

[80]     *Id.*; Pl.'s Ex. 50.

[81]     Testimony of Natale.

[82]     *Id.*

Plaintiffs did introduce evidence of a 2008 fire on a similar Performance Cruiser that was electrical in nature.[83]   However, Boyd and Boyce, who both participated in the investigation of the 2008 fire, both testified that the 2008 fire was caused by a faulty driver in an underwater electrical light supplied and manufactured by a third party.[84]   Boyce testified at length as to why the 2008 fire occurred, the problems with the third-party driver, and the steps taken by the third party to make sure that the problem would not recur.   According to Boyce, the fire occurred not only because the driver failed, but also because the driver box was not flame resistant as is required under Porter's specifications.[85]   Boyce also testified that while Porter's system did have a 25-amp circuit breaker for protection, the third-party driver did not have circuit breaker protection.   Finally, Boyce testified that the drivers were replaced in all Porter boats that used them at no cost to Porter.[86]

The Court credits Boyce's uncontested testimony on the 2008 fire and finds that the evidence regarding the 2008 fire does not suggest that a short circuit occurred on the *Budget Bender*.   The 2008 fire was caused by a faulty

---

[83]     Pl.'s Ex. 39; Pl.'s Ex. 41.

[84]     Testimony of Boyd; testimony of Boyce.

[85]     Testimony of Boyce; Pl's. Ex. 41.

[86]     *Id.*

16

third-party product, and this faulty product was not installed on the *Budget Bender* at the time of the fire.

In summary, the Court finds that the evidence submitted by the plaintiffs and the testimony given at trial does not establish the cause of the fire on the *Budget Bender*.

### E.    Redhibitory Defect

Under the *Erie* doctrine, Louisiana substantive law controls this case. *See National Liability & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Plaintiffs have presented a theory of redhibition under Louisiana law and a claim under the Louisiana Products Liability Act (LPLA).   Recovery in redhibition is limited to damage to the product itself or economic loss because of the loss of use of the product.   *Cassidy v. Ford Motor Co.*, No. 15-2483, 2016 WL 687621, at *4 (E.D. La. Feb. 19, 2016).   The LPLA, on the other hand, governs liability in tort and covers personal injury and damage to property other than the product itself.   *Id.*   Thus, plaintiffs' redhibition claim concerns damages related to the *Budget Bender* itself, and plaintiffs' LPLA claim is for recovery for Gonzalez's personal property destroyed in the fire.

17

Louisiana Civil Code articles 2520 and 2521 establish that sellers warrant the buyer against redhibitory defects in the product sold and that the product is reasonably fit for its ordinary use. This warranty covers only defects that exist at the time the product is delivered to the buyer. La. Civ. Code art. 2530. A product contains a redhibitory defect when the defect renders the product "useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." La. Civ. Code art. 2520. The existence of a redhibitory defect is a question of fact. *See Hatten v. Estes Cadillac, Inc.*, 625 F. Supp. 913, 916 (E.D. La. 1986) (citing *Newman v. Dixie Sales & Service*, 387 So.2d 1333, 1339 (La. App. 1 Cir. 1980)).

The existence of such a defect gives the buyer "the right to obtain rescission of the sale." La. Civ. Code art. 2520. If the redhibitory defect has caused the destruction of the product in question, the loss is borne by the seller, and the buyer may bring the action after the destruction occurs. *Id.* art. 2532. The seller's degree of liability depends on whether the seller knew of the defect at the time of the sale. If the seller did not know of the defect, the seller must have an opportunity to cure the defect, either through repair or replacement. *Id.* arts. 2522, 2531. If the seller was aware of the defect at the time of the sale, the buyer need not give the seller an opportunity to cure,

18

*id.* art. 2545, and the seller must pay for damages and reasonable attorney fees. *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 899 (5th Cir. 2010) (citing La. Civ. Code arts. 2522, 2545).    Regardless of actual knowledge, manufacturers are conclusively presumed to know of defects in their products.  *Id.* (citing La. Civ. Code art. 2545). Porter, as a manufacturer, is thus presumed to have known about any defects that existed when the *Budget Bender* was sold.

In order to prevail on their redhibition claim, plaintiffs must prove that "(1) the thing sold is absolutely useless for its intended purposes or that its use is so inconvenient that it must be supposed that [Gonzalez] would not have bought it had he known of the defect; [and] (2) that the defect existed at the time he purchased the thing, but was neither known [n]or apparent to him . . . ." *Alston v. Fleetwood Motor Homes of Indiana Inc.*, 480 F.3d 695, 699 (5th Cir. 2007) (citations omitted).  A defect is considered apparent, and therefore not redhibitory, if a reasonably prudent buyer would have discovered the defect upon a simple inspection of the product.  *See Poche v. Bayliner Marine Corp.*, 632 So.2d 1170, 1174 (La. App. 5 Cir. 1994) (citing *Pursell v. Kelly*, 152 So. 2d 36 (1963)). Proof of the defect may be made by direct or circumstantial evidence.  *Brandner v. Abbott Laboratories, Inc.*, No. 10-3242, 2012 WL 195540, at *6 (E.D. La. Jan. 23, 2012) (citing *Rey v.*

19

*Cuccia*, 298 So. 2d 840, 845 (La. 1974)).   If the plaintiff establishes the existence of the defect, the defendant is liable for the damage caused by the defect. *Philippe v. Browning Arms Co.*, 395 So. 2d 310, 318 (La. 1980).

Plaintiffs' proposed pre-trial order raised the issue of whether the boat's wet bar or allegedly defective electrical system caused the fire, and plaintiffs' proposed findings of fact asked the Court to find that the boat's wet bar and/or electrical system contained redhibitory defects.   In addition, plaintiffs represented that they do not need to point to a specific defect because they can rely on *res ipsa loquitur*.  The wet bar, the electrical system, and *res ipsa* will be addressed in turn.

### 1.   Defect in Wet Bar

Plaintiffs' proposed findings of fact allege that an opening between the hinge of the wet bar and the cockpit wall allowed water to leak into the boat's engine room and into the electrical system.[87]   However, the evidence does not support plaintiffs' theory.   Boyd testified that the wet bar was designed with a hinge along the back to lift the lid of the bar, and that there was a half-inch weep hole in the corner beneath the hinge to collect any water that got in through the hinge or under the hinge.[88]   Boyd also testified that there was

---

[87]    R. Doc. 58 at 4 ¶ 26.

[88]    Testimony of Boyd.

no opening between the lid hinge and wall and the engine room, but that there was foam double-stick tape behind the hinge to channel water to the weep hole.[89]  Finally, Boyd testified that the weep hole drains the channeled water out of the boat.[90]

Gonzalez testified that water would sometimes trail down from the curtains onto the wet bar, but that "it wasn't much water," and he described it as a "small bead of water."[91]  Gonzalez also testified that when he washed the boat, he would hose down the wet bar.[92]  But neither Gonzalez, nor any witness, testified as to any pre-fire water intrusion as alleged from the wet bar into the engine compartment and onto the boat's electrical system, and no photographic exhibits showing or even suggesting this water intrusion were introduced at trial.

Plaintiffs have failed to meet their burden of establishing by a preponderance of the evidence that there was any opening in the wet bar that allowed water to leak into the engine compartment and the boat's electrical system.  Therefore, plaintiffs have not shown that the wet bar is a redhibitory defect, or that any alleged defect in the wet bar caused the fire on the *Budget*

---

[89]  *Id.*
[90]  *Id.*
[91]  Testimony of Gonzalez.
[92]  *Id.*

*Bender.* Boyd's testimony and the photographs taken of the *Budget Bender* after the fire establish at most that *after the fire* there was visible corrosion on the pigtail connector under the wet bar,[93] and that the wires in the D/C connectors behind the sofa melted and eventually ignited.[94] But the evidence in the record cannot establish by a preponderance of the evidence that: (1) water intrusion through the wet bar into the engine compartment occurred during normal operation and regular maintenance of the boat; (2) any water intrusion, no matter how minimal, caused the corrosion in the pigtail connector under the wet bar; (3) the pigtail connector exhibited any corrosion before the fire; (4) any corrosion that existed before the fire caused a short circuit in the pigtail connector; (5) a short circuit, if it occurred, bypassed the boat's circuit breaker protection and travelled from the pigtail connector under the wet bar to the D/C connectors behind the sofa at the point of origin; and (6) the alleged short circuit caused the wires in the D/C connectors to overheat and melt, igniting the fire. As to corrosion, Gonzalez testified that throughout the time he owned the *Budget Bender* he never saw any corrosion in his engine room, and that he used the space heater specifically to ensure that there would be no corrosion.[95] Therefore, not only

---

[93]   Testimony of Boyd.
[94]   Testimony of Jones.
[95]   Testimony of Gonzalez.

is there no evidence establishing that this corrosion existed before the fire, but there is credible evidence suggesting that it did not.

Plaintiffs need not prove the cause of the defect, but they must prove the existence of a defect that caused the damage in question. *Commercial Union Ins. Co. v. Ryland Dodge & Chrysler, Inc.*, 457 So. 2d 255, 257 (La. App. 3 Cir. 1984). Therefore, plaintiffs have the burden of establishing that the wet bar contains a redhibitory defect that caused the fire. This is a question for the finder of fact. But without making any sufficient showing as to how the wet bar caused the fire, plaintiffs cannot establish the wet bar is in any way defective. Just like a "cause" with no effect is no cause, "a 'defect' which has no effect is no defect." *Mire v. Eatelcorp., Inc.*, 927 So. 2d 1113, 1119 (La. App. 1 Cir. 2005).

To show that the wet bar constitutes a redhibitory defect, plaintiffs must show a causal chain from the wet bar to the fire. Plaintiffs have not done so. Plaintiffs' theory of causation, unsupported by evidence, is entirely speculative and without scientific basis. On this record, the Court cannot find that any alleged defect in the wet bar rendered the boat useless. Therefore, the Court finds that plaintiffs have failed to demonstrate the presence of a redhibitory defect in the boat's wet bar.

Furthermore, Gonzalez's testimony that he hosed the wet bar while washing the boat does not by itself give rise to the inference that it is more likely than not that water intrusion in the manner alleged by plaintiffs occurred. In fact, Boyd's uncontroverted testimony about the design of the wet bar's weep hole and drain and that the wet bar was not directly above the engine compartment suggests that this alleged water intrusion did not occur because any water that got under the wet bar from rain or washing would drain out through the weep hole.[96] As mentioned above, there is no evidence in the record of any pre-fire water intrusion from the wet bar into the engine compartment.

This finding is buttressed by Boyd's uncontroverted testimony that Porter has made approximately 4,000 Performance Cruisers with the same design of wet bar and pigtail connectors, and to his knowledge no boat owner has ever complained about corrosion in the engine compartment or made similar allegations to those made by plaintiffs in this case.[97] Boyd is responsible for coordinating Porter's investigations into complaints and lawsuits, so he would be aware of those complaints if they existed. The Court has no reason to not believe his testimony.

---

[96]    Testimony of Boyd; testimony of Gonzalez.
[97]    Testimony of Boyd.

### 2.    The Electrical System

Plaintiffs' argument that the redhibitory defect is the boat's electrical system is similarly unsupported by the evidence.   Plaintiffs have not identified what specifically about the boat's electrical system was defective, where the defect in the system was located, or how this unidentified electrical defect caused the fire.   Even if plaintiffs could identify a specific defect, the evidence in the record is insufficient to establish that any electrical defect was the cause of the fire on the *Budget Bender*.   Further, to the extent that plaintiffs sought to establish that the boat lacked adequate circuit breaker protection and this somehow caused the fire, Boyce gave uncontroverted testimony that there were only four connections that passed through both the pigtail under the wet bar and the wiring harness at the point of origin, and all of them had their own circuit breaker protection.[98]   There is no evidence that an electrical system arranged in this manner is insufficient or inherently defective.

### 3.    Res Ipsa Loquitur

Plaintiffs argue that they may recover under the theory of *res ipsa loquitur* because the *Budget Bender* would not have spontaneously caught on fire while moored in the absence of a redhibitory defect.   In their brief on

---

[98]    Testimony of Boyce.

redhibition, plaintiffs argue that *res ipsa* is available in redhibition cases, but the lone case cited by plaintiffs does not support that proposition.  That case, *Coates v. Anco Insulations, Inc.*, 786 So. 2d 749, 756 (La. App. 4 Cir. 2001), only mentions *res ipsa* briefly and in connection with another case, *Bunge Corp. v. GATX Corp.*, 557 So. 2d 1376 (La. 1990), and *Bunge* merely lists the theories of liability plaintiff asserted. 557 So. 2d at 1378 (noting that the plaintiff's theories of recovery "included claims in redhibition, express and implied warranty, tort, contract, res ipsa loquitur, and strict liability").

Furthermore, the civil action of redhibition in Louisiana is similar to the common law contract doctrines of implied warranties of merchantability and fitness for a particular purpose.  *See* Sidney D. Fazio, *A Comparison of Redhibition in Louisiana and the Uniform Commercial Code,* 19 La. L. Rev. 165, 178 (1958).  *Res ipsa loquitur* is a common law tort doctrine and is not applicable to these common law contract implied warranties.  *See, e.g.*, *Nature of Implied Warranty of Merchantability*, 1 UCC Trans. Gd. § 8:14 (2016) (collecting cases); 3 Anderson U.C.C. § 2-314:671 (3d. ed.) (same).  Therefore, the Court finds that *res ipsa loquitur* is not applicable to plaintiffs' redhibition claim.[99]

---

[99]    Plaintiffs also invoke *res ipsa* in their Louisiana Products Liability Act claim, which clearly allows for *res ipsa*.  This will be analyzed below.

Even if *res ipsa* were available in redhibition claims, it would not be applicable to plaintiffs' claim.   At the outset, the Court notes that the Louisiana Supreme Court has cautioned that *res ipsa* should be sparingly applied, *see, e.g.*, *Spott v. Otis Elevator Co.*, 601 So. 2d 1355, 1362 (La. 1992), and the existence of a defect cannot be inferred solely from the fact that an accident occurred, *Lawson v. Mitsubishi Motor Sales of Am., Inc.,* 938 So.2d 35, 48 (La. 2006).  Further, the "doctrine does not apply if direct evidence sufficiently explains the injury." *Cangelosi v. Our Lady of the Lake Regional Medical Center*, 564 So. 2d 654, 660 (La. 1989).

In order to use the doctrine, the plaintiff must set forth facts on which the doctrine may be applied.  *Id.* at 665-66.  If properly invoked, the doctrine allows the factfinder to examine the circumstances surrounding an incident and infer that a product was unreasonably dangerous and therefore defective.  *Lawson*, 938 So. 2d at 47.  The application of the doctrine requires three elements: "(1) the accident must be of a kind which ordinarily would not occur in the absence of negligence on the part of someone; (2) the injury must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the occurrence must not have been due to any voluntary action on the part of the plaintiff." *Mercadel v. Liberty Mut. Fire Ins. Co.*, No. 07-3425, 2008 WL 3850457, at *4 (citing *Dugas v. Kansas City*

*So. Ry. Lines*, 473 F.2d 821, 824 (5th Cir. 1973).  Because plaintiffs have not satisfied the second element, the Court finds that they have not shown that *res ipsa* is applicable.

Plaintiffs' argue that they need not establish Porter's exclusive control to invoke *res ipsa*, because Louisiana courts have relaxed the exclusive control element in products liability cases.  *See, e.g.*, *Spott*, 601 So.2d at 1362.  While it is true that a plaintiff can satisfy the second element by showing that the circumstances indicate that the defendant's negligence or fault (in selling a defective product)—and not other plausible explanations—was "the probable cause of the accident," *id.*, plaintiffs have not done so here.  As explained by the Louisiana Supreme Court, making this showing involves excluding the inference of both the plaintiff's own responsibility and the responsibility of other causes besides the defendant.  *Cangelosi*, 564 So. 2d at 666.  In other words, *res ipsa* is appropriate only when "the only reasonable and fair conclusion is that the accident resulted from [an act] on the part of the defendant."  *Lawson*, 938 So. 2d at 48 (citing *Jurls v. Ford Motor Co.*, 752 So. 2d 260, 265 (La. App. 2 Cir. 2000)).

As explained throughout, plaintiffs have not shown by a preponderance of the evidence that a defect in the wet bar or an unspecified electrical defect was the probable cause of the fire.  Furthermore, the Court

28

finds that while Jones' testimony excludes the possibility of intentional human activity as a cause of the fire and excludes the space heater as a non-electrical cause of the fire,[100] plaintiffs have not excluded other plausible causes of the fire to the extent required to invoke *res ipsa*.  Other plausible causes that have not been excluded include: 1) adverse electrical activity caused by the space heater or another electrical device connected to the boat's electrical system; 2) that something happened to the boat while it was in storage in Florida;[101] 3) the possibility that Gonzalez left the batteries that power the D/C circuitry on before the fire;[102] or 4) that the previous owner, Todd Kelley, did something (like install a radio cable) to the boat that caused or contributed to the fire.

While plaintiffs need not exclude all possible causes to invoke *res ipsa*, the plausibility of multiple alternative causes stands as a barrier to the doctrine's invocation.  In terms of the previous ownership of Todd Kelley, both the Louisiana Supreme Court and the Fifth Circuit have refused to apply the doctrine of *res ipsa* to a case in which the plaintiff seeking to invoke the doctrine had not excluded the possibility that a previous owner had caused or contributed to the injury in question.  *See Lawson*, 938 So. 2d at 51

---

[100]   Testimony of Jones.
[101]   Testimony of Gonzalez.
[102]   *Id.*

29

(finding *res ipsa* inappropriate in part because "plaintiffs did not adequately address the probability that a previous owner had accessed" the alleged defect in question); *Winans v. Rockwell Intern. Corp.*, 705 F.2d 1449, 1455 (5th Cir. 1983) (finding *res ipsa* inapplicable because plaintiffs failed to establish that the owners of a plane after the defendants' ownership were free of fault). Because of these possible alternative explanations, the Court cannot find that the only reasonable and fair conclusion is that the fire on the *Budget Bender* occurred because of some act of the defendant. Therefore, even if *res ipsa* applied in redhibition claims, it would not be available to plaintiffs.

Further, as the Louisiana Supreme Court pointed out in *Cangelosi*, *res ipsa* does not apply in situations where direct evidence can sufficiently explain what happened. *Cangelosi*, 564 So. 2d at 660. According to the uncontroverted testimony of Natale, plaintiffs could have taken the damaged wiring and connectors (which they removed from the boat) and performed tests and analysis that likely could have determined and explained any connection (if there was one) between the corroded pigtail and the resulting fire, or determined if a short circuit occurred and caused the fire.[103] Plaintiffs

---

[103]     *Id.*

failed to do any of this testing.[104]  The Court will not allow plaintiffs to take advantage of *res ipsa* to avoid the consequences of their failure to examine the direct evidence available to them.  *See Lawson*, 938 So. 2d at 51.

Because the Court finds that plaintiffs have not met their burden in proving the existence of a redhibitory defect on the *Budget Bender*, their claim of redhibition must fail.

### F.    Louisiana Products Liability Act Claim

Plaintiffs also bring a claim under the Louisiana Products Liability Act (LPLA).  La. Stat. Ann. § 9:2800.51, *et seq.*  The LPLA governs product liability in tort and recovery under the statute is ordinarily limited to recovery for personal injury and damage to property other than the product itself.  *Cassidy*, 2016 WL 687621, at *4 (citations omitted).

To maintain a successful products liability claim under the LPLA, a plaintiff must establish four elements: "(1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product by the claimant or

---

[104]    *See* R. Doc. 75 at 17-19.

someone else." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 260-61 (5th Cir. 2002) (quoting La. Stat. Ann. § 9:2800.54).

A plaintiff can establish that a product is unreasonably dangerous by showing at least one of the following: (1) the product is unreasonably dangerous in construction or composition as provided in La. Stat. Ann. § 9:2800.55; (2) the product is unreasonably dangerous in design as provided in La. Stat. Ann. § 9:2800.56; (3) the product is unreasonably dangerous because of inadequate warnings as provided in La. Stat. Ann. § 9:2800.57; or (4) the product is unreasonably dangerous because it does not conform to the manufacturer's express warranty about the product as provided in La. Stat. Ann. § 9:2800.58. La. Stat. Ann. § 9:2800.54. These four showings are the only ways to establish that a product is unreasonably dangerous under the LPLA. *Id.* Like claims for redhibition, the flaw that makes the product unreasonably dangerous must exist at the time the product left the manufacturer's control or result from a reasonably anticipated alteration or modification of the product. *Id.*

Plaintiffs' proposed findings of fact and conclusions of law argue that the *Budget Bender* was unreasonably dangerous in design.[105] According to the LPLA, a product is unreasonably dangerous in design if, at the time the

---

[105]   R. Doc. 58 at 17.

product left the manufacturer's control: "(1) there existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) [t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. . . ." La. Stat. Ann. § 9:2800.56. If plaintiffs successfully meet their burden on proving the existence of a design defect, they still must prove that the defect was "the most probable cause" of the fire. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994).

### 1.    *The Wet Bar*

As with their redhibition claim, plaintiffs have submitted no evidence establishing that there was a porous gap in the wet bar that was unreasonably dangerous because it allowed water into the engine compartment. But even if they had, the plaintiffs have submitted no evidence or testimony regarding an alternative design of the wet bar. Under the LPLA, plaintiffs must not only identify the defect that made the boat unreasonably dangerous, but then also establish that there existed an alternative design capable of preventing the fire. La. Stat. Ann. § 9:2800.56. Plaintiffs therefore cannot meet their

33

burden of establishing that the wet bar made the Budget Bender unreasonably dangerous in design.

Further, the Court finds that plaintiffs have not met their burden in proving causation under the LPLA.  As discussed above, the evidence and testimony establishes corrosion on the pigtail after the fire and that the wires in the D/C connectors behind the sofa melted and ignited.  None of this establishes that the wet bar allowed water intrusion into the engine compartment, or that this water intrusion caused the corrosion, or that this corrosion caused the short circuit that ultimately caused the fire.  On this basis the Court cannot find that the gap in the wet bar was a defect under the LPLA, and certainly cannot find that the gap was the "most probable cause" of caused the fire under the LPLA.  *Wheat*, 31 F.3d at 342.

### 2.    *The Electrical System*

At trial, plaintiffs also tried to argue that the Budget Bender was unreasonably dangerous because of a design defect in the boat's electrical system.  As above, plaintiffs have not specified what exactly was defective about the boat's electrical system or where this defect was located, nor have plaintiffs shown that there existed an alternative design for the boat's electrical system capable of preventing the fire.  Plaintiffs therefore cannot meet their burden of establishing that the unspecified defect in the boat's

electrical system made the Budget Bender unreasonably dangerous in design.

### 3.    Res Ipsa Loquitur

As with redhibition, plaintiffs seek to use the theory of *res ipsa loquitur* to compensate for their lack of evidence establishing that the allegedly defective wet bar or electrical system caused the fire on the *Budget Bender*. Unlike redhibition, *Res ipsa* is clearly applicable in LPLA cases. *See, e.g.*, *Lawson*, 938 So. 2d at 46. But the doctrine is unavailable here for the reason already identified: plaintiffs have not shown that "the only reasonable and fair conclusion is that the accident resulted from [an act] on the part of the defendant." *Id.* at 48 (citing *Jurls*, 752 So. 2d at 265)).

Because plaintiffs have not met their burden of establishing that the fire on the *Budget Bender* was caused by an unreasonably dangerous design defect, plaintiffs claim under the LPLA must fail.

### G.    Plaintiffs' Remaining Claim

Finally, plaintiffs assert a claim of negligence against Porter. The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability" not included in the LPLA. La. Stat. Ann. § 9:2800.52; *see also Brown v. R.J.*

*Reynolds Tobacco Co.*, 52 F.3d 524, 526 (5th Cir. 1995). Therefore, while a defendant's negligence may be relevant in establishing liability under the LPLA, stand-alone negligence claims are preempted by the LPLA and are no longer viable as an independent theory of liability against a manufacturer. *Jefferson v. Lead Industries Ass'n, Inc.*, 930 F. Supp. 241, 245 (E.D. La. 1996) (citing John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 589-90 (1989)). Thus, plaintiffs' independent negligence claim must fail as well.

## III.   CONCLUSION

Because plaintiffs have failed to establish by a preponderance of the evidence that the fire on the *Budget Bender* occurred because of a redhibitory defect or an unreasonably dangerous design flaw, the Court finds that Porter is not liable to plaintiffs. Accordingly, the Court renders judgment in favor of Porter.

New Orleans, Louisiana, this __21st__ day of November, 2016.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE